IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MARK EUGENE FUEHRER,<br><br>    Defendant. | No. CR15-1016<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.   Was the Vehicle Stop Lawful? . . . . . . . . . . . . . . . . . . . . . 5
          1.   Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          2.   Reasonable Suspicion . . . . . . . . . . . . . . . . . . . . . . 8
     B.   Was the Dog Sniff Lawful? . . . . . . . . . . . . . . . . . . . . . . 10

V.   RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## I. INTRODUCTION

On the 10th day of August 2015, this matter came on for hearing on the Motion to Suppress (docket number 18) filed by the Defendant on July 29, 2015. The Government was represented by Assistant United States Attorney Lisa C. Williams. Defendant Mark Fuehrer appeared in person and was represented by his attorney, Dennis E. McKelvie.

## II. PROCEDURAL HISTORY

On June 24, 2015, Defendant Mark Eugene Fuehrer was charged by Indictment with possession with intent to distribute a controlled substance. Defendant appeared on July 2 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on August 31, 2015.

On July 29, Defendant timely filed the instant motion to suppress. The Government filed its resistance on August 4. Because of the pending motion to suppress, the trial was continued to October 13, 2015.

## III. RELEVANT FACTS

In December 2014, Josh Mulnix, a special agent with the Iowa Division of Narcotics Enforcement ("DNE") received information from a confidential source ("CS") that Defendant was involved in the distribution of methamphetamine. Initially, the CS's knowledge of Defendant's alleged involvement in the distribution of methamphetamine was "second-hand." The CS subsequently reported to Mulnix, however, that he or she had been to Defendant's residence and had seen what appeared to be a baggie of methamphetamine. The CS also reported that Defendant's source of methamphetamine was "Marty" in Monticello.

Agent Mulnix also learned that the Dubuque Drug Task Force, conducting an independent investigation, had arranged a "controlled buy" of methamphetamine. The seller in that transaction showed up in a Chevy Blazer registered to Defendant. On cross-examination, Mulnix testified that the CS later told him that Defendant had sold the Chevy Blazer. Mulnix did not know whether the sale occurred before or after the controlled buy, but Mulnix did not hear until later that the vehicle was sold.

2

On January 6, 2015, Agent Mulnix applied for, and received, a warrant allowing the DNE to attach a tracker device to a GMC Jimmie registered to Defendant.[1] *See* Government's Exhibit 1. According to Mulnix, the tracker device showed Defendant's vehicle traveling back-and-forth to the residence of Martin Lawrence, near Monticello. Mulnix learned from the DEA Drug Task Force that it had performed multiple purchases of ice methamphetamine from Lawrence.

On January 11, 2015, Agent Mulnix learned that Defendant's GMC Jimmie was leaving Dubuque and heading westbound on Highway 20. Mulnix knew that this was one of the routes taken by Defendant in going to Monticello. Mulnix intercepted Defendant's vehicle and followed it to Lawrence's residence near Monticello. Mulnix believed that Defendant had traveled to Lawrence's residence to purchase methamphetamine for resale in Dubuque. Accordingly, a decision was made to stop Defendant's vehicle as he headed back to Dubuque.

Agent Mulnix contacted Sergeant Pape of the Dubuque County Sheriff's Office, who is a supervisor on the Dubuque Drug Task Force. Pape contacted two Dubuque County deputies to conduct a traffic stop. Deputy Sheriff Adam Williams testified that he coordinated with Deputy Carney to effect the stop. The two deputies set up on Highway 151, which was the route being taken by Defendant back to Dubuque. Williams positioned himself to operate stationary radar, while Carney was approximately a mile to the south in order to give Williams a "heads-up" when Defendant's car was approaching.

Deputy Williams testified he has operated the same vehicle and the same radar device since July 2009. The radar device is certified by the manufacturer's representative twice per year, and Williams testified he also checks its accuracy against the speedometer in his squad car. Tuning forks may also be used to check the accuracy of the radar unit,

---

[1] In fact, the DNE apparently obtained three tracker warrants for vehicles registered to Defendant.

although Williams does not commonly use that method. Williams checked the radar against his speedometer on January 11, 2015, and opined that he believed the radar was "extremely reliable."

Highway 151 in that location is a four lane divided highway. According to Deputy Williams, he set up approximately 10-15 feet off the traveled roadway. As Defendant's vehicle came over a hill approximately one-quarter mile away, the radar registered Defendant's speed at 66 miles per hour in a 65 mile-per-hour zone. Because Defendant's speed exceeded the posted speed limit, Williams effected a traffic stop.

Defendant pulled over in response to Deputy Williams activating his emergency lights. Williams approached Defendant's vehicle on the passenger side, told Defendant why he was stopped, and asked for his driver's license, registration, and insurance.[2] Defendant told Williams that he did not have his driver's license on him and believed he had lost it. It also took a few minutes for Defendant to locate a current proof of insurance. Because Defendant did not have a driver's license on his person, Williams instructed him to come back to the squad car so that Williams could verify Defendant was licensed to drive.

The video recording shows that Deputy Carney, who works with a drug-sniffing dog, arrived on the scene less than two minutes after Defendant's vehicle was stopped. Approximately three minutes into the stop, Defendant accompanied Deputy Williams back to the squad car and was placed in the back seat after being patted down. Less than a

---

[2] A video and audio recording of the vehicle stop was introduced as Government's Exhibit 2.

4

minute later, Carney had the dog conduct a "free air sniff" around Defendant's vehicle.[3] The dog alerted to the presence of narcotics.

After Deputy Williams completed the warning ticket (Government's Exhibit 3) and provided it to Defendant, Deputy Carney advised Defendant that the dog had alerted to the presence of narcotics and the officers would be conducting a search of Defendant's vehicle.[4] Defendant was also *Mirandized* at that time. Agent Mulnix, who had pulled over earlier to await the results of the traffic stop, then approached the scene and spoke with Defendant. Defendant denied any knowledge of the drugs found by officers in his vehicle.

## IV. DISCUSSION

In his motion to suppress, Defendant raises two issues. First, Defendant asserts that the vehicle stop "was pretextual and not supported by probable cause." Second, Defendant argues the "dog-sniff search employed by law enforcement during his traffic stop was not incident to the traffic violation investigation and was made in violation of his Fourth Amendment rights."[5]

### A. Was the Vehicle Stop Lawful?

The law regarding vehicle stops is well-established, and was recently summarized by the Eighth Circuit Court of Appeals:

---

[3] The dash camera in Deputy Williams' car does not show the passenger side of Defendant's vehicle. Accordingly, it is impossible to tell precisely when the dog sniff began. The sniff was completed, however, within approximately eight minutes after the initial stop.

[4] The initial vehicle stop lasted approximately 14 minutes.

[5] Defendant does not challenge the qualifications of Deputy Carney or the drug-sniffing dog, nor does he contest the claim that the dog alerted to the presence of narcotics. In addition, Defendant concedes that when a properly trained drug dog alerts to the presence of narcotics, probable cause exists to search the vehicle. *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010).

5

> The Fourth Amendment prohibits unreasonable searches and seizures. A traffic stop constitutes a seizure of a vehicle's occupants, including any passengers. A traffic stop must be supported by reasonable suspicion or probable cause. A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. Any traffic violation, however minor, provides probable cause for a traffic stop. The determination of whether probable cause, or reasonable suspicion, existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time. Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop. Mistakes of law or fact, if objectively reasonable, may still justify a valid stop.

*United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012) (internal quotations and all citations omitted). Accordingly, the Court must determine whether the vehicle stop in this case was supported by probable cause or reasonable suspicion.

### 1. *Probable Cause*

Deploying stationary radar, Deputy Williams detected Defendant traveling 66 miles per in a 65 mile-per-hour zone — one mile over the posted speed limit. As set forth above, "any traffic violation, however minor, provides probable cause for a traffic stop." *See also United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (*en banc*). Iowa Code § 321.285 makes it unlawful to drive a motor vehicle in excess of the posted speed limit. A violation occurs whether the motorist is traveling one mile-per-hour over the limit, or two miles-per-hour over, or five, or ten. Here, radar detected Defendant traveling in excess of the posted speed limit, albeit barely.

It is unlikely Deputy Williams would have stopped Defendant if law enforcement did not believe he was transporting drugs. That is, the Government concedes the officers had an ulterior motive in conducting the traffic stop. However, "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *United States v.*

6

*Gunnell*, 775 F.3d 1079, 1083 (8th Cir. 2015) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

> Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant. Similarly, it is irrelevant that the officer would have ignored the violation but for his ulterior motive.

*Gunnell*, 775 F.3d at 1083 (quotation marks and internal citation omitted).

Defendant argues that a pretextual traffic stop violates the Fourth Amendment, citing *United States v. Eldridge*, 984 F.2d 943 (8th Cir. 1993). His reliance on *Eldridge* is misplaced. There, the vehicle was stopped for driving at "an excessive rate of speed." The record is silent regarding how the vehicle's speed was determined. The Court noted that "[p]retextual traffic stops are a violation of the Fourth Amendment." *Id.* at 947. In the very next sentence, however, the Court stated it is "well settled" that when "an officer observes a traffic offense — however minor — he has probable cause to stop a vehicle." *Id.* at 948. The defendant argued in *Eldridge* that there was no credible evidence that a traffic violation occurred. The Eighth Circuit found that the district court's conclusion that the officer's testimony was credible and that the stop was not pretextual was supported by the evidence.

Defendant claims that probable cause is lacking because the radar device may have been off by one mile-per-hour. In his brief, Defendant argues that it is "common knowledge" that radar devices have a recognized margin of error or, as referred to by Defendant, a "standard deviation." In support of his argument, Defendant offered the operator's manual on a handheld directional radar device manufactured by a different company. *See* Defendant's Exhibit A. In questioning Deputy Williams, Defendant suggested that external factors may affect a radar unit's performance.

I find Defendant's argument unpersuasive. The Court first notes that because the operator's manual does not apply to the model or manufacturer of the radar unit used by Deputy Williams, it is unknown whether the same factors may apply to Williams' radar

7

unit. In any event, there is no evidence that any of the external factors apply here.[6] Moreover, Williams was entitled to rely on the accuracy of the radar unit, if it was objectively reasonable for him to do so. Here, Williams had checked the radar unit against the speedometer in his car, and there was no reason for him to doubt its accuracy.

Deputy Williams testified that his radar unit detected Defendant traveling 66 miles per hour in a 65 mile-per-hour zone. I find his testimony to be credible. Because there was probable cause to believe Defendant was speeding in violation of Iowa Code § 321.285, Williams was authorized to stop Defendant's vehicle. Because there was probable cause to conduct the vehicle stop, the fact that the officers had an "ulterior motive" in stopping Defendant is irrelevant. *Gunnell*, 775 F.3d at 1083. Could the State prove Defendant was speeding beyond a reasonable doubt? Maybe not. But that is not the standard to be employed in determining whether the traffic stop violated the Fourth Amendment. Rather, it is only necessary for the Government to show *probable cause* that Defendant was driving in excess of the speed limit. It has done so here.

### 2. *Reasonable Suspicion*

Alternatively, the Government argues the vehicle stop was lawful because there was reasonable suspicion to believe Defendant was engaged in criminal activity; specifically, possession of a controlled substance with intent to deliver. As set forth above, I believe the traffic stop was authorized by probable cause to believe Defendant was speeding and, therefore, it is unnecessary to consider the Government's alternative argument. If the district court disagrees with my analysis on the issue of probable cause, however, I will also address the issue of reasonable suspicion.

---

[6] The Court notes parenthetically that the "angular interference" effect described in Defendant's Exhibit A actually inures to the motorist's benefit. That is, this effect "causes the system to display a speed which is lower than the actual vehicle speed." Defendant's Exhibit A at 24.

Because a traffic stop constitutes a seizure within the meaning of the Fourth Amendment, a traffic stop must be supported by at least "a reasonable, articulable suspicion that criminal activity is occurring." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011). "If reasonable suspicion exists, officers may briefly detain a vehicle and its occupants to conduct a reasonable investigation." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012). In determining whether reasonable suspicion supports a *Terry*-type stop, "the standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (quoting *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002)). "A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Hollins*, 685 F.3d at 706.

Here, Agent Mulnix received information from a confidential source that Defendant was involved in the distribution of methamphetamine. The CS reported that he or she had seen what appeared to be a baggie of methamphetamine at Defendant's residence. The CS reported that Defendant obtained his methamphetamine from "Marty" in Monticello. After obtaining a tracking warrant, authorities learned that Defendant's vehicle was traveling back-and-forth to the residence of Martin Lawrence, near Monticello. Mulnix learned from the DEA Drug Task Force that it had performed multiple purchases of methamphetamine from Lawrence. Mulnix also knew that the Dubuque Drug Task Force had conducted a controlled buy of methamphetamine, where the seller appeared driving a vehicle registered to Defendant. All of these facts, taken together with rational inferences, support a reasonable suspicion that Defendant had methamphetamine in his

9

possession when he was returning from Lawrence's residence on January 11. Accordingly, the vehicle stop was not violative of the Fourth Amendment.

## B. Was the Dog Sniff Lawful?

After Defendant's vehicle was stopped, Deputy Carney deployed his drug-sniffing dog to conduct an open-air sniff. The dog alerted to the presence of narcotics, which provided probable cause to search Defendant's vehicle. *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010). Defendant claims, however, that the dog sniff was unlawful, citing *Rodriguez v. United States*, 575 U.S. ____, 135 S. Ct. 1609 (2015).

In *Illinois v. Caballes*, 543 U.S. 405 (2005), the Supreme Court held that a dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures. The Court's recent holding in *Rodriguez* does not change the law in that regard. Rather, the question presented in *Rodriguez* was "whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop." *Rodriguez*, 135 S. Ct. at 1612. The Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the constitution's shield against unreasonable seizures." *Id.*

In *Rodriguez*, the defendant's vehicle was stopped after an officer observed it veering slowly onto the shoulder of the highway. The officer issued the driver a warning ticket for driving on the shoulder of the road. After the written warning had been completed and delivered to the driver, the officer asked the driver for permission to walk his dog around the vehicle. After the driver refused, the officer instructed the driver to turn off the ignition, exit his vehicle, and stand in front of the patrol car to wait for a second officer. A second officer arrived a few minutes later, and the dog was then deployed to conduct an open-air sniff of the vehicle.

The facts in this case are easily distinguishable from those in *Rodriguez*. Here, Deputy Carney arrived with his drug-sniffing dog just two minutes after Deputy Williams stopped Defendant's vehicle. Defendant was still in his car when Carney arrived. After

Defendant complied with Williams' request to sit in the back of the patrol car, Carney almost immediately deployed his dog to conduct an open-air sniff. It would appear that the dog sniff was completed within approximately eight minutes of the original stop, and well before Williams completed issuing a warning ticket for speeding. That is, there is no evidence that the dog sniff prolonged the stop in any manner. The holding in *Rodriguez* is not implicated, and the dog sniff was lawful pursuant to *Caballes*. There was no constitutional violation.

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 18) filed by Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on August 10, 2015.*

DATED this 20th day of August, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA